WHITE OAK CORPORATION v. STATE OF CONNECTICUT

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and MACDONALD, Js.

Argued January 13—decision released March 23, 1976

*Edwin A. Lassman,* with whom was *Steven D. Bartelstone,* for the appellant (plaintiff).

*William J. White,* assistant attorney general, with whom were *Edward T. Blair,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellee (defendant).

MacDonald, J. The plaintiff, a highway construction contractor, has appealed from a judgment rendered in favor of the defendant state of Connecticut in an action brought pursuant to the provisions of § 4-61 of the General Statutes[1] for damages arising out of a contract for the construction of a state highway. The facts as set forth in the finding are undisputed. The plaintiff bid upon and was awarded by the state a contract in excess of six million dollars for the construction and relocation of a highway known as route 8. The contract, in general, called for building bridges, blasting, relocating utilities, excavating and filling and the

[1] "[General Statutes] Sec. 4-61. ACTIONS AGAINST THE STATE ON HIGHWAY AND PUBLIC WORKS CONTRACTS. Any person, firm or corporation which has entered into a contract with the state, acting through any of its departments, commissions or other agencies, for the design, construction, repair or alteration of any state highway, bridge, building or other public works may, in the event of any disputed claims under such contract, bring an action against the state to the superior court for Hartford county for the purpose of having such claims determined, provided notice of the general nature of such claims shall have been given in writing to the department administering the contract not later than two years after the acceptance of the work by the agency head evidenced by a certificate of acceptance issued to the contractor. No action shall be brought under this section later than three years from the date of such acceptance of the work by the agency head as so evidenced. Acceptance of an amount offered as final payment shall not preclude any person, firm or corporation from bringing a claim under this section. Such action shall be tried to the court without a jury. All legal defenses except governmental immunity shall be reserved to the state. Any action brought under this section shall be privileged in respect to assignment for trial upon motion of either party."

plaintiff was required, among other things, to provide and incorporate into the work various building materials, including sand, stone, loam, gravel and bituminous material. In general, payment was to be for accepted work in place. In addition, the contract contained several special provisions including one entitled "Escalator Clause Pertaining to Changes in Common Carrier Rates," the interpretation of which constitutes the single issue raised by this appeal.

The special provision in question, which is set forth in full in the footnote,[2] provides, where applicable, for an adjustment in payment to the contractor "to compensate for increases or decreases in cost due to changes in common carrier rates becoming effective after the date of opening of bids and before the date stipulated for completion of the work, as adjusted because of authorized extensions of time." The plaintiff, in addition to its construction activities, was also duly licensed by the public utilities commission as a common carrier and, at some time after the work called for by the contract began, an increase in the local tariffs charged by the plaintiff as a common carrier for hauling bulk

---

[2] "COMMON CARRIER RATES. ESCALATOR CLAUSE: It is understood and agreed that the accepted proposal for this project is based on common carrier rates on file with the Interstate Commerce Commission or with the Public Utility Commission of Connecticut and in effect on the date of opening of bid.

Where such is the case, payment to the contractor will be adjusted to compensate for increases or decreases in cost due to changes in common carrier rates becoming effective after the date of opening of bids and before the date stipulated for completion of the work, as adjusted because of authorized extensions of time. The adjustment will be limited to an amount determined as follows:

The adjustment shall be the product of the increase or decrease in the said common carrier rates multiplied by the net quantity of material shipped at the new rates to the work and incorporated therein, all as shown by receipted common carrier bills."

materials by dump trucks was authorized by the commission. The hauling of most of the bulk materials for the highway project involved here, including sand, stone, gravel, loam and bituminous concrete, was performed by trucks owned by the plaintiff, although some also were hauled by trucks owned by Connecticut Sand and Stone Corporation, a closely related corporation which had the same main office and practically the same officers and directors as the plaintiff but which was not a common carrier.

Approximately two years after completion of the project, the plaintiff sent a letter to the defendant requesting an adjustment under the so-called escalator clause because of an increase in the hauling rates for common carriers effective June 7, 1965, which it claimed entitled it to additional sums with respect to the transportation of bulk materials in its own trucks as well as in the trucks of its affiliate corporation, Connecticut Sand and Stone Corporation. Accompanying this request, in addition to correspondence between the two corporations with respect to the rate increase, was a document appearing to be an invoice or bill from Connecticut Sand and Stone Corporation to the plaintiff for "additional charge for hauling materials to the above project . . . due to increase in tariff rates." Although that invoice or bill appeared to be marked "paid," no money actually changed hands between the two corporations; rather, mutual book entries were made. The trial court found that these mutual book entries were circuitous and would cancel each other and that the plaintiff did not actually incur an increase in cost due to changes in common carrier rates within the meaning of those words in the escalator clause, and this finding was not disputed.

Upon the foregoing facts, the trial court concluded that the plaintiff had failed to show that there was an increased cost to it due to changes in common carrier rates; that in hauling materials to the project in its own trucks the plaintiff was performing services for itself and not as a common carrier; that the hauling performed by Connecticut Sand and Stone Corporation does not qualify for additional compensation under the escalator clause because it was not a common carrier and a receipted bill from it, accordingly, was not a bill from a common carrier; that the escalator clause applies only to services performed for the plaintiff by another common carrier; and finally that the plaintiff was not entitled to the additional compensation claimed. The plaintiff's assignment of errors attacks only the validity of the foregoing conclusions and not that of the facts found, squarely raising as the issue to be determined by us whether the court arrived at a fair and reasonable interpretation of the escalator clause in the contract in concluding that it applied only to hauling services performed for the plaintiff contractor by another common carrier and not to such services performed by the plaintiff for itself nor to hauling services performed for it by another carrier which was not a common carrier.

"The court's conclusions which have been attacked are to be tested by the finding. . . . These conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case." *Cecio Bros., Inc.* v. *Feldmann,* 161 Conn. 265, 271, 287 A.2d 374; *Johnston Jewels, Ltd.* v. *Leonard,* 156 Conn. 75, 79, 239 A.2d 500; *Craig* v. *Dunleavy,* 154 Conn. 100, 105, 221 A.2d 855; Maltbie, Conn. App. Proc. § 166. One

of the rules applicable to the determination of a dispute over the meaning of a contract is that pertaining to determination of the intent of the parties. "The oft-repeated rule is that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words in the light of the circumstances surrounding the execution of the writing and in the light of the object of the parties in executing the contract." *New Haven Sand Blast Co.* v. *Dreisbach,* 102 Conn. 169, 180, 128 A. 320. And, as we recently stated in *Anderson* v. *Pension & Retirement Board,* 167 Conn. 352, 354, 355 A.2d 283: "The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used. . . . The words used by the parties 'must be accorded their common meaning and usage where they can be sensibly applied to the subject matter of the contract.' *Beach* v. *Beach,* 141 Conn. 583, 589, 107 A.2d 629; *Sturtevant* v. *Sturtevant,* . . . [146 Conn. 644, 647, 153 A.2d 828]."

In according "the words used by the parties" their "common meaning and usage," the trial court first analyzed the phrase "to compensate for increases or decreases in cost due to changes in common carrier rates." It cited the definition of a motor common carrier in § 16-281 (c) of the General Statutes as one who operates a motor vehicle "in the transportation of property . . . for the general public, for hire," and referred to *Ace-High Dresses, Inc.* v. *J. C. Trucking Co., Inc.,* 122 Conn. 578, 581, 191 A. 536, where this court clarified that definition

by stating that a common carrier "must be engaged in the business of carrying goods for others as a public employment," quoting from 1 Hutchinson, Carriers (3d Ed.) §§ 47, 48. The court correctly concluded that the words "common carrier rates" in the escalator clause referred to rates for services that a motor common carrier performs for others, and not to rates for services not performed as a common carrier, and hence that the words do not apply to services that the plaintiff performed for itself and not for others. The correctness of this conclusion is strengthened by the words in the same sentence of the escalator clause providing for payments to the contractor to be adjusted "to compensate for increases or decreases in cost" due to changes in such rates. These words clearly require a showing by the plaintiff that there has been an increase *in cost* due to the changes, for they would not automatically increase the cost so long as the contractor was himself performing the service, as would be the case where an independent common carrier performing such service would be legally bound to increase the charge, thus actually increasing the cost of that service to the contractor.

The mere fact that the plaintiff, in addition to being a general contractor also was licensed as a common carrier does not support its contention that, in hauling the materials required for fulfillment of its contract, it was operating as a common carrier. In *Colli* v. *Real Estate Commission,* 169 Conn. 445, 364 A.2d 167, we recognized that the mere fact that an individual is licensed as a real estate broker does not mean that he acts in that capacity in every real estate transaction in which he participates. See *Santa Fe, Prescott & Phoenix Ry. Co.* v. *Grant Brothers Construction Co.,* 228

U.S. 177, 33 S. Ct. 474, 57 L. Ed. 787. Since it was the plaintiff's contractual obligation to provide the materials and to incorporate them into the work, it clearly was hauling materials which it was obligated to supply and which it itself used and consumed in constructing the highway. See *Fusco-Amatruda Co.* v. *Tax Commissioner,* 168 Conn. 597, 601, 362 A.2d 847.

The correctness of the court's conclusion is further strengthened by the language in the third paragraph of the escalator clause which specifies that the amount of any adjustment claimed must be "shown by receipted common carrier bills," which clearly indicates (1) that a common carrier must have rendered a bill to the contractor and (2) that the contractor must have paid that bill. The plaintiff's argument that these words merely indicate the method by which the amount of the adjustment is to be proved overlooks the fact that if this were the intention of the parties, the use of the word "receipted" would be unnecessary. Of course, the receipted bill furnished to the plaintiff by Connecticut Sand and Stone Corporation does not meet the stated requirements since it is not a bill from a common carrier. The meaning of the escalator clause appears to be unambiguous and its wording clearly supports the court's conclusions.

There is no error.

In this opinion the other judges concurred.