[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
In this action, which was commenced by the service of process on or about May 14, 1997, plaintiff Lisa Lind-Larsen, formerly known as Lise-Lotte Knudsen ("plaintiff"), seeks money damages and other relief from three defendants — Fleet National Bank of Connecticut and its subsidiary, GTT Corp., Trustee (collectively "Fleet"), and Ocwen Federal Bank, FSB ("Ocwen") — in connection with their efforts to foreclose on two of her mortgages. The first is a residential mortgage on her primary residence, located at 6 Packer Brook Road in Redding, Connecticut ("the residential mortgage"); the second is a commercial mortgage on a property she hoped to develop known as the "Sanford Homestead," located at 140 Black Rock Turnpike in Redding, Connecticut ("the Sanford Homestead mortgage").
In her original complaint dated April 15, 1997 ("Complaint"), which she entitled a "Substituted Complaint," the plaintiff introduced her substantive allegations with the following preface:
CT Page 8181 Plaintiff commenced this action on March 15, 1996, CV-96-32 39 35. A judgment of non-suit entered on December 2, 1996. Plaintiff brings this substituted complaint pursuant to CGS Sec. 52-592.
Thereafter, she pleaded: in Counts One through Seven, a series of claims against defendant Fleet, in its capacity as successor-in-interest to Shawmut Bank Connecticut N.A. ("Shawmut") and Connecticut National Bank ("CNB") with respect to her Sanford Homestead mortgage; and in Count Eight, a single claim against defendant Wilshire Credit Corporation ("Wilshire"), in what then was its capacity as current holder of her residential mortgage.[1] Defendant Ocwen was later substituted as a party for defendant Wilshire when Ocwen took assignment of the plaintiff's residential mortgage and became the current holder thereof.
The case is now before the Court on the defendants' separate motions for summary judgment as to all counts of the Complaint that pertain to them. Defendant Fleet contends, inter alia, that the claims made against it in Counts One through Five are all barred by applicable statutes of limitations; and that the claims made against it in Counts Six and Seven are defeated by the plain language of the December 14, 1993 Stipulated Judgment upon which they are based. Defendant Ocwen, in turn, contends that the claims made against it in Count Eight are legally untenable for several reasons, including failure to state any cognizable cause of action for which it might be held legally responsible. Each party has submitted multiple briefs and substantial documentary materials in support of his/its position on the defendants' motions.
 Factual Background and Procedural History
This is the latest in a series of actions between the plaintiff and these defendants or their predecessors-in-interest to the plaintiff's residential and/or Sanford Homestead mortgages concerning efforts by the defendants or their predecessors to foreclose on those mortgages. It comes before the Court with the following factual background and procedural history.
In April 1988, the plaintiff refinanced her primary residence in Redding, Connecticut with CNB. Her purposes for refinancing were twofold: to acquire funds for the development of the Sanford Homestead and to pay down the principal on a prior CNB commercial mortgage on that property. Complaint, ¶ 1-4. The plaintiff's plan was to improve the Sanford Homestead, then to subdivide it into four residential properties, for rent or for sale. Id., ¶ 1-8.
In 1990, Gateway Bank ("Gateway"), which by then had acquired the CT Page 8182 Sanford Homestead mortgage from CNB, responded to the plaintiff's delinquency in making payments under that mortgage by bringing an action to foreclose thereon ("the Foreclosure Action").[2] On or about January 1, 1991, Shawmut acquired the Sanford Homestead mortgage from Gateway, and thus became the substituted plaintiff in the Foreclosure Action.
During 1991 and 1992, the plaintiff claims that she had several offers to purchase the Sanford Homestead, all of which were frustrated by the pendency of the Foreclosure Action. The plaintiff further claims that Shawmut's encumbrance of the property in that period had such a detrimental effect upon her that, after a failed attempt to sell the property on April 17, 1992, she suffered a "stress-induced respiratory failure" which resulted in her hospitalization at Danbury Hospital.
On June 13, 1993, the plaintiff filed a lawsuit against Shawmut ("the 1993 Action"),[3] in which she alleged that Shawmut's prosecution of the Foreclosure Action and refusal to convey title to the Sanford Homestead to her constituted negligence and unfair trade practices. Six months later, however, on December 13, 1993, the 1993 Action was withdrawn as part of a settlement agreement between the plaintiff and Shawmut to resolve all claims pending between them by the entry of a Stipulated Judgment. The terms of their agreement, as stated on the record on December 13, 1993 and embodied in the Court's written Order of December 14, 1993 which adopted and approved them, were as follows:
 After the oral stipulation and agreement of the parties was heard in open court, the Court enters a judgment of strict foreclosure,
and FINDS
 that the toatal [sic] debt as of December 14, 1993 is $580,437.53; and the per diem is $79.14; and that the Attorney's Fees are $13,125.00; and that the Appraiser's Fee is $1,800.00; and that the Title Search Fee is $150.00; and that the appraised value of the property is $663,000.00.
And it is hereby ORDERED that Law Day of February 17, 1994 is set for the owners of the equity and subsequent business and banking days for subsequent encumbrances [sic] in inverse order of their priority; and that upon payment by Mrs. Knudsen [the current plaintiff, Mrs. Larsen] to the Plaintiff CT Page 8183 [Shawmut] on or before March 1, 1994, of $350,000.00 in good funds, the Plaintiff Bank [Shawmut] will thereupon quitclaim Lots One, Three, and Four to Mrs. Knudsen [the current plaintiff] or her designee, subject to all prior encumbrances including the taxes and any fire district taxes, and anything of that nature and will provide Mrs. Knudsen [the current plaintiff] with a satisfaction of judgment and a limited release; and that Mrs. Knudsen [the current plaintiff]
withdraw the action entitled Lise Lotte Knudsen v. Shawmut Bank, CV 314091, now pending in this court [the plaintiff's 1993 Action].
Under these terms, the plaintiff could fully satisfy her obligations to Shawmut under the Stipulated Judgment, and thereby receive a limited release and a satisfaction of judgment from Shawmut and reacquire Shawmut's interest in three of the four lots on the Sanford Homestead property, if it paid Shawmut the sum of $350,000 "on or before March 1, 1994." Id.
The plaintiff, with Shawmut's knowledge, intended to raise the $350,000 needed to satisfy the Stipulated Judgment, and thereby reacquire Lots One, Three and Four of the Sanford Homestead, by selling Lot One to her tenant, Karen E. Cooper, for $462,500. Even so, the parties rights and obligations under the settlement agreement were not in any way tied to or conditioned on the consummation of that sale.
In fact, the sale of Lot One was never consummated, for when a problem arose that delayed the date of closing until after March 1, 1994, Shawmut refused the plaintiff's request to extend her own deadline for making the $350,000 payment beyond that date. As a result, the plaintiff did not raise or tender to Shawmut the $350,000 she needed to satisfy the Stipulated Judgment on or before March 1, 1994.
On March 4, 1994, three days after the plaintiff failed to make the $350,000 payment contemplated by the Stipulated Judgment, the plaintiff commenced a second action against Shawmut (the "1994 Action")[4] to impose a constructive trust on the Sanford Homestead and compel Shawmut to "honor the settlement agreement of December 14, 1993." The plaintiff alleged in her 1994 Action that Shawmut had breached the Stipulated Judgment by refusing to extend the "window" during which it would accept payment beyond March 1, 1994. On that score, she claimed that the Stipulated Judgment required Shawmut to deal with her reasonably and in CT Page 8184 good faith, and thus to give her a reasonable extension of the payment deadline. Shawmut's failure to do so, she claimed, constituted a repudiation of the Stipulated Judgment and fraud.
In connection with the 1994 Action, the plaintiff filed a notice of lispendens on the Sanford Homestead. Shawmut responded to this notice by applying to the Court to have it discharged. The alleged basis for the lispendens was the plaintiff's claim that Shawmut had a duty to perform beyond the terms expressly stated in the Stipulated Judgment, to wit: a duty to grant her a reasonable extension of the March 1, 1994 deadline for making the $350,000 payment required to satisfy the Stipulated Judgment and reacquire Lots One, Three and Four of the Sanford Homestead. After a hearing, Judge Edward Stodolink found no probable cause to sustain the notice of lis pendens, and thus ordered it discharged.
After examining the law governing stipulated judgments, Judge Stodolink found "it . . . clear that the March 1, 1994 deadline was indeed a cutoff date." Memorandum of Decision, Shawmut Bank v. Lise-Lotte Knudsen
(Stodolink, J., J.D. Danbury, July 20, 1994), p. 4. He thus concluded that the plaintiff "had no right to demand a conveyance beyond March 1, 1994." Id. In so ruling, Judge Stodolink noted that if the plaintiff's interpretation of the law were accepted, and stipulated judgments could be extended beyond their terms, it "would serve to undermine the principle of the courts in Connecticut to encourage stipulated judgments," and would "unnecessarily instill an element of uncertainty to judgments entered by stipulation and destroy the finality of those judgments." Id. Judge Stodolink's ruling was later affirmed per curiam by the Appellate Court. Shawmut Bank v. Knudsen, 38 Conn. App. 919 (1995), cert. denied,235 Conn. 920 (1995).
On December 7, 1994, while her appeal from Judge Stodolink's ruling was still pending, the plaintiff filed a third action against Shawmut and one of its officers for alleged perjury in the lis pendens hearing (the "Perjury Action").[5] In connection with the Perjury Action, the plaintiff filed a second notice of lis pendens against the Sanford Homestead on November 21, 1995, which Shawmut again moved to have discharged. The plaintiff's second effort to file a notice of lispendens was no more successful than her first. It resulted both in the discharge of her notice of lis pendens and in the issuance of an order prohibiting her from further encumbering the Sanford Homestead property without the Court's express permission. Memorandum of Decision, GTTCorporation as Trustee of Onyx Properties v. Lise-Lotte Knudsen Docket No. CV 95-0322841 (Stodolink, J., J.D. Danbury, June 14, 1996).
On March 8, 1996, the plaintiff commenced yet another action against CT Page 8185 Shawmut (the "1996 Action").[6] To a great degree, the claims and allegations presented in the 1996 Action mirrored those which the plaintiff had made in her 1993 and 1994 Actions. Thus, the first five counts of her 1996 Complaint, in which she accused Shawmut of wrongful refusal to release her mortgages, common-law negligence, unfair trade practices, and other tortious conduct in pursuing its Foreclosure Action in 1991 and 1992, realleged claims which she first made in her 1993 Action — the action she withdrew under the terms of the Stipulated Judgment. The sixth count, in turn, was based upon Shawmut's alleged breach of the Stipulated Judgment — a claim she first made in her 1994 Action.[7] Only the seventh count, which was brought against O.C.I. Mortgage Company, Inc. ("OCI") of Austin, Texas, as assignee and then-current holder of the plaintiff's residential mortgage, presented any new claims.
Following the commencement of the 1996 Action, defendant Fleet, as successor to Shawmut, requested that the plaintiff revise certain counts of her 1996 complaint. When the plaintiff failed to respond appropriately to the request to revise, Fleet filed a motion for judgment of nonsuit, which was granted by the Court on December 2, 1996. Knudsen v. FleetNational Bank, et al., CV-96-0323935-S (1996, Moraghan, J., Danbury J.D.). The plaintiff's later motion to reopen the judgment of nonsuit was denied on December 24, 1996.
Finally, on April 15, 1997, the plaintiff commenced this action ("the Instant Action") in an attempt to reinstitute the claims on which she had been nonsuited in her 1996 Action. In her Complaint, as previously noted, the plaintiff expressly invoked the Accidental Failure of Suit Statute, General Statutes § 52-592.
 The Standard
Summary judgment shall be rendered if the pleadings, affidavits, and any other proof submitted show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Practice Book § 17-49; Gurliacci v. Mayer, 218 Conn. 531, 562
(1991). The Court must view the evidence in the light most favorable to the nonmoving party. Catz v. Rubenstein, 201 Conn. 39, 49 (1986). Summary judgment may also be granted where it is clear that a claim is barred by an applicable statute of limitations. Woodside Green CondominiumAssociation, Inc. v. Woodside Green, Inc., 9 Conn.L.Rptr. 637 (1993, Lewis, J.)
 Counts One Through Five
As to the claims presented in the first five counts of the plaintiff's CT Page 8186 Complaint, defendant Fleet has moved this Court for summary judgment on the ground that each such claim is barred by the applicable statute of limitations. To prevail on a summary judgment motion based on the statute of limitations, a defendant must initially show that there is no genuine issue of material fact that the claim in question was not brought within the limitations period prescribed by law.
In this case, the plaintiff does not dispute the defendant's contention that the claims presented in Counts One through Five were not brought within the limitations periods prescribed by law. She insists, however, and has specially pleaded, that each such claim is saved, despite its apparent untimeliness, by the Accidental Failure of Suit Statute, General Statutes § 52-592.
At all times relevant to this case, Section 52-592 has provided as follows:
 If any action, commenced within the time limited by law, has failed one or more times to be tried on its merits . . . for any matter of form . . . the plaintiff . . . may commence a new action . . . for the same cause at any time within one year after the determination of the original action.
So written, the statute empowers a plaintiff to commence a "new action" outside the limitations period prescribed by law whenever four statutory requirements are met: (1) that the "new action" is "for the same cause" as an earlier, "original action;" (2) that the original action "failed one or more times to be tried on its merits . . . for any matter of form;" (3) that the new action was commenced "within one year of the determination of the original action;" and (4) that the original action itself was "commenced within the time limited by law." By proving each of these elements by a fair preponderance of the evidence at trial, a plaintiff can save an otherwise untimely action from successful challenge under the statute of limitations.
By the same token, a plaintiff whose otherwise untimely claims are challenged on a motion for summary judgment based on the statute of limitations can defeat the motion by demonstrating that there is a genuine issue of material fact as to the applicability of the Accidental Failure of Suit Statute to her challenged claims. To be effective, such a demonstration requires competent proof as to each essential element of Accidental Failure of Suit Statute.
Here, the plaintiff contends that the instant action is saved by the Accidental Failure of Suit Statute because this action was commenced CT Page 8187 within one year of the determination of her virtually identical 1996 Action. The 1996 Action, she claims, "failed . . . to be tried on its merits . . . for a matter of form" when a judgment of nonsuit was entered against her for alleged failure to respond appropriately to the defendant's request to revise.
Defendant Fleet responds to this argument by asserting that even if the claims presented in Counts One through Five are for the same causes as those presented in the 1996 Action, the plaintiff has no proof that any of them satisfies two essential elements of the Accidental Failure of Suit Statute, to wit: (1) that the plaintiff's 1996 Action failed to be tried on its merits for a matter of form, within the meaning of Section52-592; or (2) that even if it did fail to be tried on the merits for a matter of form, the 1996 Action was commenced within the limitations period prescribed by law for any of the claims presented in those first five counts. Because this Court agrees with the defendant's second argument as to each challenged count, it need not decide the first.[8]
In Count One, the plaintiff alleges that Shawmut's refusal to release the Sanford Homestead mortgage in order to facilitate the April 17, 1992 sale of that property was in violation of General Statutes § 49-8.[9]
Section 49-8 creates a statutory cause of action for damages arising from a mortgagee's refusal to release a mortgage under certain circumstances enumerated in the statute.
An action for damages under Section 49-8 is an action founded upon a tort. Therefore, since the statute which defines and establishes that action does not specify a different period of limitations for it, such an action is subject to the general three-year statute of limitations for tort claims set forth in General Statutes § 52-577. See UnitedAircraft Corp. v. International Assn. of Machinists, 161 Conn. 79, 107
(1971) (holding that any action founded upon a tort is governed by Section 52-577 unless a different period of limitations is specifically-prescribed within the statute that defines and establishes it)
Section 52-577 provides that "no action founded upon a tort shall be brought but within three years from the act or omission complained of." As alleged in Count One, all of the wrongful acts or omissions the plaintiff complains of occurred on or before April 17, 1992. Therefore, by operation of Section 52-577, the last day on which the plaintiff could have commenced a timely action under Section 49-8 on the basis of those acts or omissions was April 17, 1995.
Against this background, the defendant has clearly established both that the Instant Action is untimely as to the claim presented in Count CT Page 8188 One, and that that claim cannot be saved from successful challenge under the statute of limitations by the Accidental Failure of Suit Statute. The Instant Action was untimely as to the claim presented in Count One because it was not commenced until April 15, 1997, almost two full years after the expiration of the three-year limitations period prescribed by Section 52-577. Similarly, the plaintiff's 1996 Action was untimely with respect to that claim, because that Action was not commenced until March 15, 1996, nearly eleven months after the three-year limitations period expired. Because an untimely claim cannot be saved from successful challenge under the statute of limitations by the plaintiff's prior, untimely assertion of that same claim in another action, the claim presented in Count One cannot be saved by the plaintiff's untimely bringing of that same claim in her 1996 Action. Accordingly, defendant Fleet is entitled to summary judgment on Count One of the plaintiff's Complaint.
Counts Two and Three of the plaintiff's Complaint both present claims for damages under General Statutes § 42-110a et seq., the Connecticut Unfair Trade Practices Act ("CUTPA"). Each such claim is based upon Shawmut's alleged refusal to respond to the plaintiff's request for releases of her mortgages to enable her to sell part of the Sanford Homestead on April 17, 1992.[10]
As alleged violations of CUTPA, the claims presented in Counts Two and Three are governed by the special statute of limitations for CUTPA claims set forth in General Statutes § 42-110g (f). Under that statute, a private action to recover damages under CUTPA "may not be brought more than three years after the occurrence of a violation of this chapter."
As described in Counts Two and Three, all of the conduct by which Shawmut is claimed to have violated CUTPA occurred on or before April 17, 1992. Therefore, by operation of Section 42-110g (f), the last day on which the plaintiff could have brought a timely CUTPA claim based on that conduct was April 17, 1995.
Against this background, the defendant has clearly established both that the claims presented in Counts Two and Three were untimely brought in the Instant Action and that they cannot be saved from the bar of the statute of limitations by the Accidental Failure of Suit Statute. The plaintiff's pending CUTPA claims were untimely brought because this action was not commenced until April 15, 1997, almost two full years after the expiration of the three-year limitations period established by Section42-110g (f). Similarly, those claims were untimely brought in the plaintiff's 1996 Action, for that Action was not commenced until March 15, 1996, almost eleven months after the three-year limitations period expired. Because, to reiterate, an untimely claim cannot be saved under CT Page 8189 the Accidental Failure of Suit Statute unless the earlier action in which it was asserted was timely commenced, the plaintiff's current CUTPA claims cannot be saved by the plaintiff's untimely 1996 Action. Accordingly, defendant Fleet is entitled to summary judgment on the CUTPA claims presented in Counts Two and Three.
Count Four alleges that by failing to respond to the plaintiff's requests for releases of her mortgages before the date of the proposed sale of part of the Sanford Homestead on April 17, 1992, Shawmut negligently caused her to lose the sale, and thus to suffer "acute stress-induced respiratory failure" which required her to be hospitalized in Danbury Hospital. Id., ¶ 4-2. The plaintiff claims that as a result of Shawmut's negligence and her ensuing medical crisis, she suffered "physical injury and permanent damage to her health" and incurred significant medical costs. Id., ¶ 4-3.
As a claim to recover damages for personal injury allegedly caused by negligence, the claim presented in Count Four is governed by General Statutes § 52-584, which provides in part as follows:
 No action to recover damages for injury to the person . . . caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or . . . should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of.
Under Section 52-584, the plaintiff had at most three years from the date of the defendant's final act or omission to file her negligence claim against it.
As in the first three Counts of her Complaint, all of the conduct complained of in the plaintiff's Fourth Count allegedly took place on or prior to April 17, 1992, when the proposed sale was frustrated by such conduct and the plaintiff suffered respiratory failure which resulted in her hospitalization. Therefore, by operation of Section 52-584, the last day on which the plaintiff could have filed a timely negligence claim against Shawmut based on that conduct was April 17, 1995.
Against this background, both the plaintiff's present negligence claim and any such claim presented in her 1996 Action were clearly brought outside the three-year limitations period prescribed by law. The present claim is untimely because this lawsuit was not commenced until April 15, 1997, almost two years after the limitations period expired. The plaintiff's 1996 Action was also untimely with respect to that claim, CT Page 8190 since it was not commenced until March 15, 1996, nearly eleven months after the limitations period expired. Because the 1996 Action was untimely commenced with respect to the plaintiff's negligence claim, the prior bringing of that Action cannot save the plaintiff's current negligence claim under the Accidental Failure of Suit Statute. Accordingly, defendant Fleet's motion for summary judgment must be granted with respect to Count Four.
In Count Five, the plaintiff alleges that Shawmut's failure to respond to her requests for releases of her mortgages or to take remedial action constituted an intentional breach of the agreement between her and CNB with respect to repayment of her residential mortgage. Id., ¶ 5-1. The plaintiff further alleges that Shawmut subsequently "affirmatively repudiated the agreement with the plaintiff concerning the method of repayment of her residential mortgage by stating that none of the proceeds from the first sale could be used to pay down her residential mortgage." Id., ¶ 5-2. Shawmut's conduct continued, the plaintiff claims, until it sold her residential mortgage in a bulk sale of nonperforming assets on September 12, 1992. Id., ¶ 5-3. Its negative consequences, however, continued, for her residence remained in foreclosure litigation long thereafter, allegedly causing her "great pain and suffering."
As a claim to recover money damages for personal injury, this claim is a tort-based cause of action. Therefore, like the statutory cause of action created by General Statutes § 49-8, it is subject to the three-year limitations period prescribed by Section 52-577.
Under the facts alleged in Count Five, Shawmut's wrongful conduct continued until it finally sold the plaintiff's residential mortgage on September 12, 1992. Therefore, by operation of Section 52-577, the last day on which the plaintiff could lawfully have brought an action asserting the claim presented in Count Five was September 12, 1995.
Here again, as in the first four Counts, both the claim presented in the Fifth Count and its counterpart, if any, in the plaintiff's 1996 Action were commenced long after the applicable statute of limitations had run — nineteen months for the former, six months for the latter. Because the claim presented in Count Five cannot be saved under the Accidental Failure of Suit Statute by the plaintiff's untimely filing of the same claim in her 1996 Action, defendant Fleet is also entitled to summary judgment on that claim.
 Counts Six and Seven
Counts Six and Seven of the plaintiff's Complaint both concern the CT Page 8191 Stipulated Judgment which she and Shawmut agreed to resolve her 1993 Action and Shawmut's Foreclosure Action on December 13, 1993. Under the terms of the Stipulated Judgment, as set forth in writing in the Order of the Court, a judgment of strict foreclosure was entered with respect to the Sanford Homestead and the following orders were issued:
 (1) that Law Day of February 17, 1994 is set for the owners of the equity and subsequent business and banking days for subsequent encumbrances in inverse order of their priority; (2) that upon payment by Mrs. Knudsen [n/k/a Larsen] to the plaintiff [Shawmut] on or before March 1, 1994, of $350,000.00 in good funds, the Plaintiff Bank will thereupon quitclaim Lots One, Three, and Four to Mrs. Knudsen or her designee, subject to all prior encumbrances including the taxes and any fire district taxes, and anything of that nature and will provide Mrs. Knudsen with a satisfaction of judgment and a limited release; (3) and that Mrs. Knudsen withdraw the action entitled Lise Lotte Knudsen v. Shawmut Bank, CV 314091, now pending in this court [the 1993 Action].
Stipulated Judgment.
In Count Six, the plaintiff alleges that she and Shawmut agreed to the Stipulated Judgment with the understanding that she would raise the $350,000 needed to reacquire Lots One, Three and Four by selling Lot One to her tenants for $462,500, under a Purchase Agreement entered into on September 21, 1993. Later, however, when the closing date for that sale had to be extended beyond the March 1, 1994 payment deadline, the plaintiff claims that Shawmut repudiated its agreement with her by refusing to grant her a reasonable extension of that deadline to conclude the sale and raise the $350,000. By so doing, claims the plaintiff, Shawmut defrauded her of her equity in the Sanford Homestead.
Though the plaintiff makes no specific claim for relief in Count Six, the parties have treated that Count as a restatement of her claim for an order of constructive trust as to the Sanford Homestead — a claim she first presented in her 1994 Action.
In Count Seven of her Complaint, the plaintiff further claims that Shawmut refused to honor the settlement agreement of December 14, 1993 pursuant to a conspiracy to sell the property to the plaintiff's tenant-buyers through its subsidiaries, Onyx Properties and GTT Corp., in which its officers were principals. Id., ¶ 7-2. This conspiracy, she alleges, was carried on by Shawmut with the intent to cause her financial harm and pain and suffering. Id.
Defendant Fleet has moved for summary judgment with respect to Counts Six and Seven on several grounds. Among them is the claim, which this CT Page 8192 Court finds persuasive, that there is no factual or legal basis whatsoever for the plaintiff's basic assertion, which is central to both Counts, that Shawmut breached or repudiated the settlement agreement by not affording her a reasonable extension of the March 1, 1994 deadline for making the $350,000 payment required to repurchase Lots One, Three and Four of the Sanford Homestead. That assertion, it correctly contends, is flatly contradicted by the plain and unambiguous language of the agreement itself, as embodied in the Stipulated Judgment. The Court thus agrees, for the reasons that follow, that the defendant is entitled to summary judgment on the claims presented in Counts Six and Seven.[11]
A stipulated judgment is "`not a judicial determination of any litigated right. . . . It may be defined as a contract of the parties acknowledged in open court and ordered to be recorded by a court of competent jurisdiction. . . . The essence of the judgment is that the parties to the litigation have voluntarily entered into an agreement setting their dispute or disputes at rest and that, upon the agreement, the court has entered judgment according to the terms of the agreement'"Guille v. Guille, 196 Conn. 260, 265 (1985) (quoting Bryan v. Reynolds,143 Conn. 456, 460 (1956)). Accord, Suffield Development Assoc. Ltd.Partnership v. National Loan Investors, L.P., 60 Conn. App. 842, 846
(2000). As such, a stipulated judgment "`should be interpreted consistently with accepted contract principles.'" Guille v. Guille, supra, 196 Conn. at 265 (quoting Marisco v. Marisco, 195 Conn. 491, 493
(1985)).
"The interpretation of a stipulated judgment, like the interpretation of a contract, is usually a question of fact." DeCaro v. Zoning Board ofAppeals of the Town of Westport, 2000 WL 966145 (Conn.Super. 2000, D'Andrea, J.) (quoting Town Close Associates v. Planning ZoningCommission, 42 Conn. App. 94, 107 (1996)). Even so, "[w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law."Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P.,252 Conn. 479, 495 (2000); Levine v. Massey, 232 Conn. 272, 277 (1995);Bank of Boston Connecticut v. Schlesinger, 220 Conn. 152, 158 (1991).
On December 13, 1993, the plaintiff and Shawmut agreed to enter into a Stipulated Judgment to resolve all claims pending between them in Shawmut's Foreclosure Action and the plaintiff's 1993 Action. After the parties stated the terms of their agreement on the record in open court, the Court issued a one-page, typewritten Stipulated Judgment which recited those terms and formally entered them as orders of the Court. Significantly, neither party ever challenged the correctness or completeness of the Court's description of the parties' agreement, as set forth in the Stipulated Judgment. CT Page 8193
The terms of the parties' agreement, as set forth in the Stipulated Judgment, are definitive as to the process by which the plaintiff could satisfy that its obligations thereunder and reacquire Lots One, Three and Four of the Sanford Homestead. It provided, to reiterate, that "upon payment by Mrs. Knudsen [the current plaintiff] to the Plaintiff[Shawmut] on or before March 1, 1994, of $350,000.00 in good funds, the Plaintiff Bank [Shawmut] will thereupon quitclaim Lots One, Three, and Four to Mrs. Knudsen [the current plaintiff] or her designee, subject to all prior encumbrances including the taxes and any fire district taxes, and anything of that nature and will provide Mrs. Knudsen [the currentplaintiff] with a satisfaction of judgment and a limited release[.]" So stating, the Stipulated Judgment unambiguously provided that, to reacquire the lots in question, the plaintiff had to pay Shawmut a definite sum by a definite date, to wit: $350,000 on or before March 1, 1994.
Having stated those terms of payment with precision, the Stipulated Judgment must be interpreted in strict accordance with those terms.SantaMaria v. Manship, 7 Conn. App. 537, 542 (1986) (the terms of a stipulated judgment may not be extended beyond the terms of the agreement entered into). Because the purchase price of $350,000 was clearly stated in the Stipulated Judgment, no lesser sum could satisfy the plaintiff's payment obligation thereunder. Nothing in the Stipulated Judgment provided or suggested that that sum certain could ever be adjusted for any reason.
Similarly, because March 1, 1994 was expressly identified as the date "on or before" which such payment was to be made, the plaintiff had no right under the Stipulated Judgment to make her payment on any later date. Again, nothing in the Stipulated Judgment provided or suggested that that deadline could be changed for any reason.
Against this background, the Court agrees with Fleet that Shawmut did not violate its settlement agreement with the plaintiff by refusing to extend the deadline for making her payment beyond March 1, 1994. Even if Shawmut was aware, as the plaintiff has alleged, that the plaintiff planned to raise the money to make the $350,000 payment with proceeds from the sale of Lot One, such awareness did not obligate Shawmut to extend the March 1 deadline when it learned that the sale could not be consummated by that date. Had that been the parties' intention, they could easily have so provided in their settlement agreement, as by making the timing of the plaintiff's payment dependent upon the closing date on Lot One. Plainly, they did not do so despite their mutual awareness of the plaintiff's plan to fund her payment with the proceeds of that sale. CT Page 8194
Therefore, since one essential element of the plaintiff's claim in Count Six is that Shawmut breached and repudiated its settlement agreement by refusing her request to extend the payment deadline beyond March 1, the defendant is entitled to summary judgment on Count Six as a matter of law. However reasonable the plaintiff's request for an extension of the deadline may have been in the circumstances presented, there is no genuine issue of material fact that Shawmut acted well within its rights under the Stipulated Judgment when it refused that request.
For similar reasons, the plaintiff cannot prevail on her civil conspiracy claim, as presented in Count Seven. To prevail on a claim of civil conspiracy, a plaintiff must prove "(1) a combination of two or more persons, (2) to do a criminal . . . act or a lawful act by criminal or unlawful means, (3) an act done . . . in furtherance of the object, (4) which act results in damage to the plaintiff." Williams v. Maislen,116 Conn. 433, 437 (1933); see Talit v. Peterson, 44 Conn. Sup. 490
(1995). Here, the plaintiff's claim of conspiracy fails, as a matter of law, because it cannot prove the second essential element of that claim.
As alleged in Count Seven, the only unlawful conduct which Shawmut conspired to engage in was refusing to honor its settlement agreement with the plaintiff. The plaintiff claims, here as in Count Six, that Shawmut refused to honor the settlement agreement by refusing to agree to a reasonable extension of the March 1, 1994 payment deadline when her sale of Lot One could not be completed before that date. Because that conduct, as previously demonstrated, was entirely lawful under the Stipulated Judgment, it obviously cannot serve as a valid basis for a civil conspiracy claim. Therefore, Fleet is also entitled to summary judgment on Count Seven.
 Count Eight
In Count Eight of her Complaint, the plaintiff brings a claim against defendant Ocwen, in its capacity as assignee and current holder of her residential mortgage, and thus as the latest substituted plaintiff in a twelve-year-old action to foreclose on that mortgage entitled GatewayBank v. Knudsen, Docket No. CV 90-0299519 ("the Residential Foreclosure Action"). The plaintiff claims that Ocwen, as successor-in-interest to Connecticut National Bank, Shawmut Bank, and several other entities with respect to her residential mortgage, is bound in the Residential Foreclosure Action by the following defense, which she has duly interposed therein:
repudiation by Shawmut Bank's Investment Department of the banking relationship which plaintiff had with Connecticut National Bank and the agreement with CT Page 8195 respect to the interdependency of the residential and commercial loans.
Complaint, ¶ 8-2. In light of the alleged "interdependency" of her residential and commercial loans, and thus of her residential and commercial (Sanford Homestead) mortgages, the plaintiff claims that, "by virtue of the allegations in this complaint as proven[, she] is entitled to set-off in the [Residential Foreclosure Action], . . . in which [Ocwen] is the . . . substituted [plaintiff], Id., ¶ 8-7. The plaintiff concludes Count Eight by alleging that she "has been made to suffer financial losses and emotional pain and suffering by the actions of Shawmut Bank and subsited [sic] holders of the residential mortgage."Id., ¶ 8-9.
On their face, the foregoing allegations appear to support two very different requests for relief. The first is a request that all claims proved by her in the Instant Action, though asserted against Fleet, as successor to Shawmut with respect to her commercial (Sanford Homestead) mortgage, be set off against Ocwen's claims under her residential
mortgage in the Residential Foreclosure Action. The second is a claim for damages for unspecified financial losses and emotional injuries she claims to have suffered because of the actions of Shawmut and other "subs[t]it[ut]ed holders of the residential mortgage," impliedly including Ocwen.
The plaintiff's initial request — that her pending claims against Fleet, as successor to Shawmut with respect to the Sanford Homestead mortgage, be set off against Ocwen's claims under her residential mortgage in the Residential Foreclosure Action — seems at first blush curious, for if such a claim is viable on any theory, it must obviously be pleaded in the action where set-off is sought. That action is not the Instant Action, where Ocwen has asserted no claims against the plaintiff, but the Residential Foreclosure Action, where as current holder of the plaintiff's residential mortgage, Ocwen is the substituted plaintiff.
Here, however, the plaintiff's assertion of a right of set-of off is not a substantive claim for relief by way of set-off in the Instant Action, but a procedural request that the Instant Action be consolidated with the Residential Foreclosure Action so that her present claims, if proved at trial, can be set off against Ocwen's claims in that Action. Accordingly, in the ad damnum clause of her Complaint, the plaintiff specifically requests an "Order of Consolidation of pending litigation between plaintiff and Fleet National Bank of Connecticut, formerly Shawmut Bank, N.A." Complaint, p. 10. CT Page 8196
Much might be said about the propriety of including a request for consolidation of cases in the ad damnum clause of a civil complaint. Moreover, if the plaintiff were actually seeking a set-off in the Instant Action, which she manifestly is not, much might also be said about the propriety of basing a claim of set-off on the tortious conduct of one's predecessors-in-interest to a mortgage, or of imposing legal obligations on the holder of a mortgage based upon undocumented understandings or agreements between the holder's predecessors and the mortgagor as to how the latter's obligations under the mortgage would be enforced. Indeed, the parties have briefed the latter two issues at length in preparing their arguments on Ocwen's pending motion.
Here, however, none of these issues need be reached or decided in light of the precise and limited nature of the plaintiff's request for relief and the stated basis for that request. The plaintiff, to reiterate, claims that, "by virtue of the allegations in this complaint as proven[, she is entitled to set-off [in the Residential Foreclosure Action]."Id., ¶ 8-2 (Emphasis added). Therefore, by the logic of her own allegations, the plaintiff claims no right of set-off in the Residential Foreclosure Action as to any of pending claim she cannot prove.
This Court has decided, in this Memorandum of Decision, that defendant Fleet is entitled to summary judgment on each and every claim the plaintiff has brought against it in the Instant Case. Therefore, since the plaintiff cannot prevail on any of those claims as a matter of law, she has no valid basis for claiming set-off in the Residential Foreclosure Action based on those claims. Accordingly, her request for an Order of Consolidation of all litigation between herself and Fleet, to permit her to assert her claims against Fleet as set-offs in the Residential Foreclosure Action, has been rendered moot by this Court's disposition of Fleet's motion for summary judgment. That request must therefore be rejected as a matter of law.
The plaintiff's second request for relief in Count Eight, to reiterate, is a request for money damages for alleged "financial losses and emotional pain and suffering" she claims she has suffered due to "the actions of Shawmut Bank and subs[t]it[ut]ed holders of the residential mortgage, impliedly including Ocwen. Defendant Ocwen seeks summary judgment as to this portion of the plaintiff's claim on two basic grounds, with which this Court agrees.
First, the defendant rightly notes that it cannot be held liable for the tortious conduct of another unless the other was acting as its agent when it engaged in such conduct, or it voluntarily assumed responsibility for the other's conduct at a later time. Here, claims the defendant, there is no proof whatsoever that any of its predecessors-in-interest to CT Page 8197 the plaintiff's residential mortgage was acting as its agent when, as holders of the mortgage, they allegedly engaged in tortious conduct that harmed the plaintiff. Similarly, there is no proof at all that Ocwen ever voluntarily accepted legal responsibility for any of its predecessors' tortious conduct, either when it took assignment of the plaintiff's mortgage or at any time thereafter. Therefore, the only possible basis upon which Ocwen could conceivably be found liable under the Eighth Count is alleged tortious conduct it personally engaged in that proximately caused the plaintiff harm. Teitelman v. Bloomstein, 155 Conn. 653, 657
(1967); Magarian v. Bessoni, 160 Conn. 442, 445 (1971).
In this case, however, there is no allegation of tortious conduct by defendant Ocwen of any kind, before or after it became a party to this case, and likewise there is no proof that anything it has ever done, tortious or otherwise, ever proximately caused the plaintiff any harm. In short, the plaintiff's only stated claims against Ocwen are vicarious, based solely upon prior alleged tortious conduct of Shawmut and others for which it has no legal responsibility as a matter of law. Absent any basis, in the Complaint or in the evidence, for any direct claim against defendant Ocwen, Ocwen is entitled to summary judgment as a matter of law.
 Conclusion
For all of the foregoing reasons, the Court hereby ORDERS that the motions for summary judgment of defendants Fleet and Ocwen be GRANTED in their entirety.
IT IS SO ORDERED this 26th day of June, 2002.
 __________________, J. Michael R. Sheldon